**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HARVARD FIRE PROTECTION DISTRICT, MARENGO FIRE PROTECTION DISTRICT, et al., individually and on behalf of all other similarly situated Illinois consumers,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY; EIDP, Inc. (formerly known as E. I. DU PONT DE NEMOURS AND COMPANY); DUPONT DE NEMOURS, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; GLOBE MANUFACTURING COMPANY, LLC; LAKELAND INDUSTRIES, INC.; and W.L. GORE & ASSOCIATES, INC.,<br><br>Defendants. | Case No.: |

**CLASS ACTION COMPLAINT**

The Plaintiffs, Harvard Fire Protection District and Marengo Fire Protection District, individually and on behalf of all others similarly situated, by and through their attorneys, allege the following facts and claims upon personal knowledge, investigation of counsel, and/or information and belief.

## I. INTRODUCTION

1. There are over 1,100 fire departments with collectively over 39,000 firefighters across Illinois who perform essential and dangerous work to save lives and protect public health, safety, and property every day around the clock. In the course of their duties, firefighters wear

specialized coats, pants, and other turnout gear equipment (collectively, "turnout gear"), to protect themselves from extreme heat, open flames, smoke, and toxic environments.

2. Turnout gear is specifically designed, manufactured, marketed, and sold to keep firefighters safe, even when experiencing the hazardous conditions inherent in firefighting. To perform as intended, the gear must be heat resistant, flame retardant, durable, and capable of repelling water and other liquids while being worn for extended periods under physically demanding conditions.

3. Defendants are the manufacturers of per- and polyfluoroalkyl substances ("PFAS") for use in turnout gear, products containing PFAS for use in turnout gear, and turnout gear containing such PFAS, including the outer shell, moisture barrier, and thermal liner for turnout gear coats and pants. As used in this complaint, PFAS includes all of the salts, ionic states, and acid forms of PFAS and the precursor chemicals that break down into other PFAS.

4. PFAS are human-made chemicals that are persistent, meaning they do not break down in the environment. According to researchers, certain PFAS pose risks to human health.

5. Defendants are 3M Company and various DuPont-related entities, major chemical companies that manufactured PFAS and PFAS-containing products for use in turnout gear, W.L. Gore & Associates, Inc., a manufacturer of protective fabrics using PFAS and PFAS-containing products for use in turnout gear, and Globe Manufacturing Company, LLC and Lakeland Industries, Inc., manufacturers of turnout gear that contains PFAS.

6. 3M Company ("3M") manufactured PFAS from approximately the 1940s through the end of 2025. 3M manufactured perfluorooctanoic acid ("PFOA") from approximately the 1940s until 2002, was the exclusive manufacturer of perfluorooctanesulfonic acid ("PFOS") from approximately the 1940s until 2002, and manufactured some products with perfluorobutane

sulfonic acid ("PFBS") starting in 2003. 3M used PFOS and PFBS in many of its consumer products, including Scotchgard-branded products such as water repellent treatments for use on turnout gear and other textiles.

7. EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company ("Old DuPont"), manufactured PFOA from approximately 2002 until approximately 2013. Old DuPont used PFOA starting in the 1950s in many of its consumer products, including PTFE-based products and those marketed under the Teflon brand, including for use in turnout gear. Old DuPont manufactured PTFE-based products starting in the 1950s through 2015 until transferring its performance chemicals business and some associated liabilities to The Chemours Company in 2015. Old DuPont also manufactured water repellent treatment products that contained PFAS starting in the 1970s through 2015 for use on textiles such as turnout gear and other products. The Chemours Company continued to manufacture water repellent treatment products that contained PFAS for use on textiles and other products when it was spun off from Old DuPont in 2015. The remaining DuPont-related defendants are DuPont affiliates that have manufactured PFAS chemicals and/or have succeeded to Old DuPont PFAS liabilities. Old DuPont, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc. and Corteva, Inc. are collectively referred to in this complaint as "DuPont."

8. W.L. Gore & Associates, Inc. ("Gore") for decades has manufactured protective fabrics for the inner moisture barrier of turnout gear using PTFE coatings that contained PFAS as well as other turnout gear products containing PFAS.

9. Globe Manufacturing Company, LLC ("Globe") for decades has manufactured turnout gear that contains PFAS, including PFAS-containing products from 3M, DuPont, and Gore.

10. Lakeland Industries, Inc. ("Lakeland") for decades has manufactured turnout gear that contains PFAS, including PFAS-containing products from 3M, DuPont, and Gore.

11. 3M, DuPont, and Gore for many years intentionally used PFAS as ingredients in products for use in turnout gear and knew that turnout gear contained PFAS. Globe and Lakeland for many years intentionally used PFAS in their turnout gear and knew that their turnout gear contained PFAS. 3M and DuPont knew for decades that PFAS chemicals were toxic and posed substantial risks to human health and the environment, but concealed this information and instead promoted PFAS and products containing PFAS, including for use in turnout gear, as safe and appropriate for widespread use. In 1999 a 3M environmental scientist denounced 3M's "unethical" decision to prioritize "markets, legal defensibility and image over environmental safety" when it came to PFAS. In a similar timeframe, a DuPont lawyer said that the bio-persistence of PFAS "will kill us," that "our story is not a good one," and that he had urged DuPont to "act[] responsibly" to "reduce the potential for punitives." Bio-persistence refers to the ability of certain PFAS to accumulate in the human body over time. However, DuPont's lawyer was "unsuccessful in even engaging [DuPont] in any meaningful discussion of the subject." 3M and DuPont hid information on PFAS's dangerous properties from the public, Plaintiffs, and class members for years while they continued to profit from sales of PFAS and PFAS-containing products, including for use on turnout gear.

12. Gore knew at least as early as the late 1980s that C-8 (another name for PFOA) was toxic and could accumulate in the human body, among other risks to human health. PFOA was an ingredient used to make protective fabrics for the inner moisture barrier of turnout coats, among other products. Nonetheless, in 2021, Gore publicly stated that the "potential exposures and associated risks of cancer effects from PFOA are insignificant."

13. Globe and Lakeland, as manufacturers for decades of turnout gear and components for use in turnout gear that each have held themselves out as experts in manufacturing and designing such turnout gear and turnout gear components, knew or should have known of the health risks posed by PFAS, including in turnout gear.

14. Firefighter turnout gear sold into New Illinois, including under the Globe and Lakeland brands, contained 3M and DuPont's PFAS and PFAS-containing products and Gore's PFAS-containing products at times relevant to this lawsuit. Defendants knew, or should have known, that, through normal use, wear, abrasion, laundering, and handling, PFAS can be released from the turnout gear and migrate to the inner layers of the gear that come into close and repeated contact with firefighters' skin. Firefighters wear turnout gear for long periods, often while sweating and under conditions that increase skin permeability and this can provide a skin exposure pathway for PFAS released from the turnout gear.

15. A recent study documented that firefighters have higher concentrations of certain PFAS in their blood compared to the general population and that "firefighters have a higher cancer risk compared to the general population." The study found "a significant amount of PFAS on turnout gear and their migration to untreated layers," which are sources of PFAS exposure to firefighters. Firefighter occupational cancer is the leading cause of line-of-duty deaths among firefighters.

16. Even though it was foreseeable to Defendants that firefighters would be regularly exposed to PFAS through turnout gear, 3M, DuPont, and Gore manufactured, marketed, and sold PFAS or PFAS-containing products for use in turnout gear and Globe and Lakeland manufactured, marketed, and sold turnout gear containing PFAS to municipalities and other consumers without adequately disclosing or warning that PFAS was in turnout gear, could be

released from the gear and expose firefighters to PFAS during the ordinary and intended use of turnout gear, posed risks to firefighters' health, and that such turnout gear was not suitable for the protection of firefighters' health, safety, and physical well-being, along with engaging in other unlawful conduct.

17. As scientific information about PFAS in turnout gear has continued to come to light, municipalities and fire departments are replacing PFAS-containing turnout gear at significant public expense to reduce firefighter exposure to PFAS chemicals in turnout gear.

18. Plaintiffs and class members should not bear the costs associated with replacing PFAS-containing turnout gear because Defendants for decades concealed important safety information, promoted PFAS, PFAS-containing products, and turnout gear containing PFAS as safe and appropriate for widespread use, and put profits over people. These costs were foreseeable and attributable to Defendants' decisions to manufacture, market, and sell PFAS, PFAS-containing products and turnout gear containing PFAS for decades without adequate warnings even though safer alternatives existed at all relevant times.

19. Plaintiffs and class members bring this action to recover the costs to replace turnout gear containing PFAS that they would not have bought or would have paid less for had Defendants not concealed the truth about PFAS, among other relief. Plaintiffs and class members are not seeking to recover through this complaint any relief for personal injuries or property damage.

20. The cost of turnout jackets and pants (excluding respirators and other turnout gear components such as boots) is approximately $4,000 per suit, with many fire departments providing two sets of turnout gear per firefighter. It will be very expensive to replace turnout gear containing PFAS with PFAS-free turnout gear for over 39,000 firefighters in Illinois.

21. Plaintiffs, on behalf of themselves and entities that purchased turnout gear containing PFAS in Illinois, assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various state laws seeking damages for turnout gear containing PFAS that they would have paid less for, would not have purchased, and/or need to replace, among other relief.

## II. PARTIES

***Plaintiff Harvard Fire Protection District***

22. Plaintiff Harvard Fire Protection District ("HFPD") is a municipal corporation located in Harvard, Illinois. HFPD was expressly created as a fire protection district to protect public health, safety, and welfare. The Illinois legislature has "declared as a matter of legislative determination that in order to promote and protect the health, safety, welfare and convenience of the public, it is necessary in the public interest to provide for the creation of municipal corporations known as fire protection districts and to confer upon and vest in the fire protection districts all powers necessary or appropriate in order that they may engage in the acquisition, establishment, maintenance and operation of fire stations, facilities, vehicles, apparatus and equipment for the prevention and control of fire therein and the underwater recovery of drowning victims, and provide as nearly adequate protection from fire for lives and property within the districts as possible and regulate the prevention and control of fire therein; and that the powers herein conferred upon such fire protection districts are public objects and governmental functions in the public interest." 70 ILCS 705/1.

23. HFPD provides fire and other protection over an area encompassing approximately 108.5 square miles that includes the City of Harvard and unincorporated Harvard including farms, rural areas, and small communities such as Chemung and Lawrence. HFPD

employs approximately 41 firefighters. As further explained below, HFPD purchased turnout gear containing PFAS during the relevant time period that was represented and marketed to be suitable for use by firefighters to protect their health, safety, and physical well-being when, in fact, such turnout gear posed risks to firefighters' health, safety, and physical well-being. Among other things, Defendants failed to adequately warn that the turnout gear contained toxic PFAS chemicals and was not suitable to protect firefighters' health, safety, and physical well-being. HFPD paid money for these products and suffered damages as a direct and proximate result of Defendants' unlawful conduct. HFPD sent notice through its counsel to Defendants of the claimed breaches of warranties on or about June 22, 2026 by FedEx. HFPD seeks to replace PFAS-containing turnout gear with PFAS-free turnout gear.

24. HFPD has purchased and maintained turnout gear and related personal protective equipment ("PPE") for its firefighters over many years, with most firefighters equipped with a primary set and a secondary set of turnout gear. HFPD has purchased turnout gear and related PPE for its firefighters using public funds in order to sufficiently equip its firefighters so that they may carry out the important governmental function of protecting the public from fires, medical emergencies, and other situations in which firefighter or emergency response is required.

25. HFPD's mission is to "protect the quality of life for present and future generations through interactions with our community, compassionate service and atmosphere that encourages innovation, professionalism, and diversity." It operates out of one station and is equipped with multiple engines, ladders, rescue units, and ambulances that it deploys to protect and serve the community twenty-four hours a day and seven days a week.

26. HFPD is responsible for protecting residential, commercial, manufacturing, and other areas within the district. HFPD responds to approximately 1,700 calls per year, as well as mutual aid to surrounding communities throughout the year.

27. CFD firefighters use turnout gear to safeguard them from the hazards inherent in structural firefighting and emergency response.

***Plaintiff Marengo Fire Protection District***

28. Plaintiff Marengo Fire Protection District ("MFPD") is a municipal corporation located in Marengo, Illinois. MFPD was expressly created as a fire protection district to protect public health, safety, and welfare pursuant to 70 ILCS 705/1 as described above.

29. MFPD was created in 1958 and serves an area of approximately 106 square miles. The fire district boundaries include the City of Marengo, Riley Township, and portions of Coral and Seneca Townships. MFPD employs approximately 50 firefighters. As further explained below, MFPD purchased turnout gear containing PFAS during the relevant time period that was represented and marketed to be suitable for use by firefighters to protect their health, safety, and physical well-being when, in fact, such turnout gear posed risks to firefighters' health, safety, and physical well-being. Among other things, Defendants failed to adequately warn that the turnout gear contained toxic PFAS chemicals and was not suitable to protect firefighters' health, safety, and physical well-being. MFPD paid money for these products and suffered damages as a direct and proximate result of Defendants' unlawful conduct. MFPD sent notice through its counsel to Defendants of the claimed breaches of warranties on or about June 22, 2026 by FedEx. MFPD

seeks to replace PFAS-containing turnout gear with PFAS-free turnout gear.

30. MFPD has purchased and maintained turnout gear and related PPE for its firefighters over many years, with most firefighters equipped with a primary set and a secondary set of turnout gear.

31. MFPD's mission is to "provide the highest quality of care, property conservation, and life safety initiatives." It operates out of three stations and is equipped with multiple engines, ladders, rescue units, and ambulances that it deploys to protect and serve the community twenty-four hours a day and seven days a week.

32. MFPD is responsible for protecting residential, commercial, manufacturing, and other areas within the district. MFPD responds to approximately 2,200 calls per year, as well as mutual aid to surrounding communities throughout the year.

33. MFPD firefighters use turnout gear and other PPE to safeguard them from the hazards inherent in structural firefighting and emergency response.

***Defendants***

34. Defendant 3M is a Delaware corporation that does business throughout the United States, including in Illinois. 3M has its principal place of business in St. Paul, Minnesota.

35. Defendant Old DuPont is a Delaware corporation that does business throughout the United States, including in Illinois. Old DuPont has its principal place of business in Wilmington, Delaware.

36. Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation that does business throughout the United States, including in Illinois. New DuPont has its principal place of business in Wilmington, Delaware.

37. Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States, including in Illinois. Chemours has its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its performance chemicals business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

38. Defendant The Chemours Company, FC, LLC ("Chemours FC") is a Delaware limited liability company that does business throughout the United States, including in Illinois. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures certain materials and/or chemicals that are the subject of this lawsuit.

39. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in Illinois. Corteva has its principal place of business in Wilmington, Delaware. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

40. Defendant Gore is a Delaware corporation that does business throughout the United States, including in Illinois. Gore has its principal place of business in Newark, Delaware.

41. Defendant Globe is a New Hampshire limited liability company that does business throughout the United States, including in Illinois. Globe has its principal place of business in Pittsfield, New Hampshire.

42. Defendant Lakeland is a Delaware company that does business throughout the United States, including in Illinois. Lakeland has its principal place of business in Huntsville, Alabama.

43. Each Defendant is in some manner responsible for the acts alleged herein and proximately caused injuries to Plaintiffs and members of the Class, as alleged herein.

## III. VENUE AND JURISDICTION

44. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under 18 U.S.C. § 1962.

45. This Court may exercise jurisdiction over Defendants because they either are or at the relevant time were: authorized to do business in Illinois, registered to do business with the Illinois Secretary of State, transacting sufficient business with sufficient minimum contacts in Illinois, or otherwise intentionally availing themselves of the Illinois market through the manufacturing, marketing, distribution, and/or sales of PFAS-containing products for use in turnout gear and turnout gear containing PFAS in Illinois so as to satisfy minimum contacts and to render the exercise of jurisdiction over Defendants by the Court in Illinois consistent with traditional notions of fair play and substantial justice.

46. Defendants have further subjected themselves to personal jurisdiction in Illinois by materially participating in conduct that caused intended and foreseeable harmful effects on

Plaintiffs and the class members residing in Illinois. 3M, DuPont, and Gore manufactured, marketed, distributed, and sold their PFAS and/or PFAS-containing products for use in turnout gear on a nationwide basis, including in Illinois, and knew or should have known that their conduct would reach and injure consumers in Illinois. Globe and Lakeland manufactured, marketed, distributed, and sold their turnout gear containing PFAS on a nationwide basis, including in Illinois, and knew or should have known that their conduct would reach and injure consumers in Illinois.

47. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). 3M, Old DuPont, New DuPont, Chemours, Chemours FC, Corteva, Gore, Globe, and Lakeland reside in this District within the meaning of 28 U.S.C. § 1391(c) because each is subject to the Court's personal jurisdiction with respect to the claims asserted herein.

## IV. SUMMARY OF RELEVANT CONDUCT

### A. Studies have found that PFAS poses risks to human health.

48. PFAS are human-made chemicals that do not occur naturally.

49. PFAS consist of chains of carbon and fluorine atoms that are both chemically and thermally stable; in other words, they do not readily break down and can persist in the environment for a long time. For this reason, they have been referred to as "forever chemicals."

50. PFOA and PFOS are the two most widely studied PFAS. PFOA and PFOS are fully fluorinated organic acids with eight carbon atoms. PFOA is sometimes referred to as C-8 or C8. Ammonium perfluorooctanote (APFO) is the ammonium salt of PFOA.

51. PFAS include thousands of chemicals in addition to PFOA and PFOS.

52. Humans can be exposed to PFAS through dermal absorption (i.e., skin contact), inhalation, and ingestion (i.e., eating or drinking contaminated substances). Because PFAS are

persistent and bioaccumulative, once inside the human body, PFAS can be passed to a developing fetus through the placenta or passed to infants through breast milk.

53. When exposed to high heat, PFAS can off-gas and/or degrade into highly mobile and toxic particles, increasing the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

54. Research has shown that PFAS chemicals concentrate in human blood, bones, and organs. Some PFAS chemicals, including PFOA, bioaccumulate in human blood and organs, including the kidney and liver.

55. Certain PFAS can bioaccumulate in humans for a significant period of time.

56. PFOA, PFOS, and PFHxS, among other PFAS, have been shown to bioaccumulate in humans.

57. Many studies support a finding that exposure to or ingestion of certain PFAS chemicals including PFOS and PFOA can pose risks to humans, such as cancer, liver, thyroid, and kidney disease, immune system disruption, and pregnancy-induced hypertension, among other adverse effects, depending upon one's level of exposure.

58. Human epidemiological studies, including those relied upon by the U.S. Environmental Protection Agency ("EPA") in studying the health risks of PFOA, have found associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and/or testicular and kidney cancers.

59. Recent research conducted by the National Toxicology Program of the National Institute for Environmental Health Sciences has linked certain PFOA exposures to pancreatic cancer.

60. Human epidemiological studies, including those relied upon by EPA in studying the health risks of PFOS, found associations between PFOS exposure and high cholesterol, thyroid disease, and adverse reproductive and developmental effects, including gestational diabetes, preeclampsia, and low birth weight. EPA found that the developing fetus and newborns are sensitive to PFOS-induced toxicity.

61. PFAS compounds also have been found to affect growth, learning, and behavior of infants and older children, decrease women's ability to become pregnant and to carry a pregnancy to term, and interfere with the body's natural hormones.

62. Laboratory research has found that PFOA and PFOS are toxic to laboratory animals, including reproductive, developmental, and systemic adverse effects.

63. A recent peer-reviewed study found "strong evidence" that multiple PFAS induce oxidative stress, are immunosuppressive, and modulate receptor-mediated effects.

64. The increasing scientific consensus is that exposure to lower levels of PFAS, particularly PFOA and PFOS, poses potential human health risks.

65. Polytetrafluorethylene ("PTFE") is a PFAS that is and has been used for many years to make protective fabrics for the inner moisture barrier of turnout gear. PTFE is a kind of PFAS known as a fluoropolymer.

66. The use of PTFE and other PFAS in turnout gear poses risks to human health.

67. PTFE for use in consumer products such as turnout gear contains other PFAS such as PFOA.

68. PTFE can break down at high temperatures (above 450°C) and the resulting chemicals can cause negative health impacts.

69. Peer-reviewed scientific research on fluoropolymers including PTFE has found that:

a. "there is no sufficient evidence to consider fluoropolymers as being of low concern for environmental and human health";

b. "a blanket statement that [fluoropolymers] cannot enter cells is factually inaccurate";

c. "there is no scientific basis to separate and subsequently remove fluoropolymers from discussions of other PFAS as a class or in terms of their impacts on human or environmental health"; and

d. "it would be impossible to verify the safety of all fluoropolymer products in the market based on the information available in the public domain."

**B. Scientific information on PFAS continues to evolve.**

70. EPA began to investigate PFOA and PFOS in or around 1998 following some limited disclosures by 3M and others.

71. As the science has continued to evolve, EPA has issued advisories on levels of PFAS in drinking water that may pose risks to human health.

72. EPA has issued advisories concerning lower levels of PFAS in drinking water over time.

73. More recently, in or around May 2025, EPA stated that it would proceed with maximum contaminant levels ("MCLs") in drinking water for PFOA and PFOS at 4 parts per trillion (ppt). Shortly thereafter, the federal government publicly stated that it would maintain the designation of PFOA and PFOS as hazardous substances.

**C. Turnout gear containing PFAS has been sold into Illinois.**

74. Plaintiffs and class members purchased turnout gear containing PFAS for use by firefighters who respond to fires, hazardous material incidents, and other emergency and medical situations, putting their lives at risk every day to protect public health and safety. In carrying out these duties, firefighters save lives, safeguard property, deliver emergency and medical services, conduct rescues, and aid individuals experiencing traumatic events. Plaintiffs and class members purchase turnout gear for use by firefighters to equip and protect them for this exceptionally demanding work.

75. Turnout gear is comprised of jackets, pants, and other related equipment.

76. Turnout gear jackets and pants are made up of three layers: a durable, water repellant outer shell; a middle moisture barrier; and an inner thermal liner, which is closest to the wearer's skin.

77. The outer layer serves to protect the firefighter from direct flame and is meant to provide water and oil resistance.

78. The middle moisture barrier is designed to prevent the intrusion of water, liquid chemicals, and heat, while simultaneously permitting the release of perspiration and body heat.

79. The inner thermal layer provides the majority of the thermal protection (insulation) against high ambient heat and is positioned closest to the body. It also serves to quickly wick away moisture (such as perspiration) from the skin.

80. According to peer-reviewed scientific research, all three layers of turnout gear contain PFAS.

81. Researchers have tested new turnout gear (i.e., still in the original packaging) and used turnout gear, including from Globe and using Gore fabrics, from firefighters across the United States. The gear tested was manufactured between 2002 and 2018.

82. The researchers found significant quantities of PFAS in every layer of both new turnout gear as well as used turnout gear.

83. The researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in "every textile sample tested" in both the moisture barrier and outside shell layers.

84. The turnout gear also contained significant levels of individual PFAS, including PFOA and PFBS.

85. In the middle moisture barrier of the turnout gear tested, total fluorine levels were typically greater than 30 percent, which is consistent with use of PTFE in the middle moisture barriers.

86. In all three layers of tested turnout gear, PFOA was present at high levels. For example, in one set of gear that was tested, the outer shell had 182 parts per billion (ppb) PFOA and the thermal liner contained 78 ppb PFOA.

87. The researchers found "significant fluorine signatures" in the thermal liner, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."

88. The researchers also found that "garment-to-hand transfer of total fluorine [] was also observed when researchers simply manipulated the textiles in our laboratory," which they concluded "strongly supports" that "side-chain fluoropolymers and the PFAS they bind do release to the environment upon wear."

89. Other peer-reviewed scientific research has found that firefighters have elevated blood levels of PFAS, and that dermal absorption through direct contact between the firefighters' skin and turnout gear is "a key exposure route."

90. Another study looked at controlled exposure of turnout gear to physical stressors, similar to those experienced by firefighting gear (but without the potential for alternative source exposure). It found that "[a]cross all stressed textiles, 36 PFAS were quantified above reporting limits,"; "[a]brasion increased summed PFAS concentrations for all textile types"; and weathering "consistently increased summed PFAS concentrations in outer shell textiles."

91. The potential for PFAS exposure can increase as the turnout gear is exposed to the normal wear and tear associated with performing expected duties.

92. Occupational cancer is the leading cause of line-of-duty death in the fire service. In 2025, nearly 80 percent of International Association of Fire Fighter member line-of-duty deaths were due to occupational cancer.

**D. Globe, Lakeland, and other turnout gear sold into Illinois contained 3M, DuPont, and Gore's PFAS and/or PFAS-containing products.**

93. 3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

94. 3M manufactured PFAS by electrochemical fluorination beginning in the 1940s.

95. The electrochemical fluorination process results in a product that contains and/or breaks down into compounds containing PFOS, PFOA, PFNA, PFHxS, PFBS, and/or PFHpA, among other PFAS.

96. 3M invented and was a major manufacturer of PFOA.

97. 3M was the only known manufacturer of PFOS and PFHxS in the United States.

98. 3M manufactured PFOA, PFOS, and PFBS as raw chemical materials for use in 3M products and products made by third parties.

99. 3M used PFOS in many of its consumer products, including Scotchgard-branded products. 3M used PFOS to make durable water repellents for use on textiles for decades through approximately 2002.

100. After discontinuing its use of PFOS in or around 2002, 3M started using PFBS in many of its consumer products, including Scotchgard-branded products. 3M used PFBS to make durable water repellents for use on textiles for many years. 3M was the only supplier of oil, water, and stain repellent protection products based on PFBS chemistry. 3M publicly stated in or around 2003 when it began using PFBS in consumer products that PFBS was "a sustainable alternative to PFOS-based surfactants," that it was "practically non-toxic," and that it was "not considered persistent, bioaccumulative and toxic."

101. 3M was a major manufacturer of PFBS and products containing PFBS in the United States.

102. 3M marketed and sold PFAS and products containing PFAS throughout the United States, including in Illinois.

103. 3M supplied PFAS to third parties for use in manufacturing, including but not limited to DuPont, throughout the United States.

104. DuPont began purchasing PFOA from 3M in 1951 for use in manufacturing DuPont's brand-name Teflon products.

105. In 1938, a chemist employed by DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

106. One of DuPont's major Teflon-branded products for decades was PTFE, which was used in fabrics, including for use in turnout gear. DuPont used APFO and/or PFOA as an ingredient to make the PTFE for decades and APFO and/or PFOA was present in many finished PTFE products.

107. DuPont sold PTFE for use in fabrics to Gore for many years.

108. DuPont marketed and sold PFAS and products containing PFAS throughout the United States, including in Illinois.

109. DuPont supplied PFAS to third parties for use in manufacturing.

110. DuPont for decades manufactured durable water repellents containing PFAS for use on textiles. PFAS used in DuPont's durable water repellents for use on textiles can break down into PFOA and other PFAS.

111. Although DuPont knew about the health and environmental risks of PFAS from its use of PFAS starting in 1951, DuPont began manufacturing its own PFAS in 2002 for use in manufacturing when 3M phased out production of PFOA.

112. 3M and DuPont were the only companies to manufacture PFOA in the United States. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

113. By the 1950s, PFAS were widely used in commercial manufacturing, including by 3M and DuPont. Since the 1950s, 3M and DuPont continued to manufacture, market, and sell PFAS for decades.

114. Prior to the 1950s, PFAS had never been detected in the bodies or blood of human beings.

115. In 2013, Old DuPont announced that it was planning to spin off its "performance chemicals business" into a new publicly-traded company, which ultimately became Chemours.

116. In 2015, Chemours began manufacturing, marketing, and selling performance chemicals, including PFAS.

117. Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals, including PFAS.

118. Since 2015, Chemours has manufactured, marketed, and sold durable water repellents for use on textiles that contain PFAS.

119. In 1966, Globe began manufacturing, marketing, and selling turnout gear containing PFAS.

120. Since 1966, Globe has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by 3M, DuPont, and Gore, and PFAS manufactured by 3M and/or DuPont.

121. Globe marketed and sold turnout gear containing PFAS throughout the United States, including in Illinois.

122. Gore is a global materials science company with thousands of employees.

123. Gore has stated that "[i]t has always strived to set the standards in research and development."

124. Gore was created in 1958 to manufacture, market, and sell products containing and/or using PTFE.

125. In 1969, Robert Gore, an employee of Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE, which is a type of PFAS. Gore sold ePTFE products under the brand name of GORE-TEX®.

126. Gore has stated that it invented protective apparel for firefighters and first responders using PTFE.

127. In 1980, Gore introduced GORE-TEX® Barriers for firefighting turnout gear "to protect first responders from excessive heat stress."

128. DuPont sold Teflon polymers to Gore that used PFOA as an ingredient.

129. In 2023, Gore stated that it has "over 65 years of experience processing PTFE fine powder resin into a variety of articles" and is "recognized as the global leader in expanded PTFE technologies."

130. Gore stated that since 1958 it has "developed an extensive understanding of how the characteristics of PTFE impact the ability to process it into finished articles" and that it "has collaborated with many fluoropolymer suppliers to advance their technology" since that time. Gore further stated that "[o]ver the past 65 years, we have developed unparalleled expertise in processing and expanding polymers to bring value to customers, end users and the world."

131. Gore has stated that "[t]hroughout Gore's history, the company has continually evaluated new developments in PTFE resin."

132. Gore has manufactured GORE-TEX® moisture barriers that contain PFAS for use in turnout gear for decades and for many years manufactured products from PTFE resins that used PFOA as an ingredient.

133. Gore has marketed and sold moisture barriers that contain PFAS for use in turnout gear throughout the United States, including in Illinois.

134. Gore also has operated a polymerization facility to produce custom grades of PTFE.

135. Durable water and oil repellent treatments ("DWR") are often applied to Gore's

moisture barrier products for use in turnout gear.

136. Gore currently states on its website that the "high-performing DWR treatments that Gore currently uses in its moisture barrier products are based on a type of PFAS known as short-chain side chain fluorinated polymers, which may contain trace residuals of non-polymer PFAS."

137. Lakeland has manufactured turnout gear containing PFAS for decades.

138. Lakeland has used PFAS-containing products from 3M, DuPont, and Gore in its turnout gear.

139. 3M, DuPont, and Gore PFAS and PFAS-containing products also were used in turnout gear from the Lion Group, Inc. ("Lion") for many years.

140. 3M, DuPont, and Gore designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold PFAS products for use in turnout gear purchased by and distributed to firefighters by Plaintiffs and members of the Class.

141. 3M, DuPont, and Gore intentionally used PFAS as ingredients in their PFAS products for use in turnout gear purchased by and distributed to firefighters by Plaintiffs and members of the Class.

142. 3M, DuPont, and Gore expected their PFAS and PFAS-containing products for use in turnout gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiffs and members of the Class in such a condition.

143. Globe and Lakeland designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold turnout gear containing PFAS purchased

by and distributed to firefighters by Plaintiffs and members of the Class.

144. Globe and Lakeland intentionally used PFAS products in their turnout gear purchased by and distributed to firefighters by Plaintiffs and members of the Class.

145. Globe and Lakeland expected their turnout gear containing PFAS to reach their ultimate users without substantial change in the condition in which it was designed and manufactured, and it did so reach Plaintiffs and members of the Class in such a condition.

**E. 3M has known for decades of PFAS health and environmental risks.**

146. 3M knew of the health hazards and environmental risks and impacts posed by PFAS for decades but concealed them from Plaintiffs and the public and continued to manufacture, market, distribute, and sell PFAS and products containing PFAS for decades, including for use in turnout gear.

147. 3M knew or should have known that, in its intended and/or common use, PFAS and PFAS containing products for use in turnout gear would pose risks to the health, safety, and well-being of firefighters in Illinois.

148. Based on its own internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

149. As early as the 1950s, 3M began conducting studies on the physiological and toxicological properties of PFAS. It concluded that PFAS were harmful to the environment, animals, and to humans. But while the findings of these studies were discussed internally (and often shared with its close collaborator, DuPont) they were not publicized or reported to any regulatory agency.

150. In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

151. In 1963, 3M technical manuals deemed PFAS "toxic," and 3M documented that PFAS were stable in the environment, and "completely resistant to biological attack."

152. By the 1970s, 3M had documented PFAS in fish and was aware that PFAS were hazardous to marine life.

153. In 1975, 3M scientists were informed that PFAS had been found within, and could build up in, the human body. The source of these chemicals was suspected by a researcher at the University of Florida investigating the matter to be Teflon cookware or "Scotchguarded" fabrics, but when questioned about these concerns, 3M researchers said that they "plead[ed] ignorance."

154. In 1975, 3M found that one of its PFAS chemicals, PFOS, was in the blood of the general population according to samples taken from across the United States. 3M concealed this information for almost twenty-five years. An internal document produced by 3M in discovery potentially explained this non-disclosure: "3M lawyers urge [Central Analytical Laboratory] not to release the true identity (PFOS) of the compound."

155. Since PFOS is not naturally occurring, these findings of blood in the human body reasonably should have alerted 3M that it was likely that its products were a source of this PFOS—a possibility that 3M considered internally but did not share outside the company.

156. These findings also should have alerted 3M that PFOS is persistent, bio-accumulative, and biomagnifying, as those characteristics would explain the presence of PFOS in blood from 3M's products.

157. In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

158. In 1978, 3M conducted multiple PFAS studies in monkeys and rats that showed that PFAS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic." The 3M study indicated that those aware of the results "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds."

159. A 3M internal report from 1978 warned that PFOS and PFOA "are likely to persist in the environment for extended periods." That same study found that one common PFAS compound was "found to be completely resistant to biodegradation."

160. Similarly, a 3M internal document from 1979 stated that PFOA and PFOS "are known to persist for a long time in the body and thereby give long term chronic exposure."

161. In 1979, an internal 3M report stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."

162. Despite these warnings and recommendations, 3M decided not to publish the findings of this investigation.

163. A 1979 memo from M.T. Case, formerly within 3M's medical department in Corporate Toxicology and Regulatory Services, stated that he believed it "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

164. At a meeting among 3M employees in June of 1979 discussing the "Fluorochemicals in Blood Program," an outside researcher named Dr. H.C. Hodge noted that "[r]eduction in exposure [to 3M employees to fluorochemicals] should have a top priority" and recommended that further testing be conducted. According to Dr. Hodge, "[i]t should be

determined if FC-807 [a PFAS chemical] or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

165. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal research showing that PFAS were causing birth defects in rats. Yet 3M did not alert the public or regulatory agencies of its concerns with effects of exposure to PFAS.

166. In 1984, 3M determined that PFAS were accumulating in plant workers' blood and noted that this trend should raise "serious concern."

167. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

168. In 1989, a review of mortality data among 3M's chemical division workers found, compared to average death rates in the state, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

169. 3M and DuPont routinely shared with each other, but concealed from the public, information about the risks of PFAS.

170. MSDSs are required to warn those handling hazardous chemicals about the health and environmental risks of those products, among other topics.

171. In 1997, 3M provided DuPont with an MSDS for 3M's PFOA that contained the following warning:

> **CANCER WARNING: Contains a chemical which can cause cancer (3825-24-1) (1983 and 1993 studies conducted jointly by 3M and Dupont)**

172. This MSDS sheet was sent only to DuPont.

173. Instead of informing the public about those dangers, 3M and DuPont concealed this information.

174. In 1999, a 3M scientist resigned over his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use" of PFOS, emphasizing his opinion that PFOS is the "most insidious pollutant since PCB." The scientist, Richard Purdy, described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

175. Under Section 8(e) of the United States' Toxic Substances Control Act ("TSCA"), chemical manufacturers and distributors must immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in TSCA since its enactment in 1976. See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

176. Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information" according to a former 3M employee.

177. Indeed, it was not until 1998 that the EPA was first alerted by 3M that PFAS were in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

178. After the federal government was alerted of this ubiquitous exposure, in 1999, the National Health and Nutrition Examination Survey (NHANES) began measuring blood PFAS in

the U.S. population. NHANES states that today, "[n]early all people in the U.S. have PFAS in their blood."

179. In or about 2000, the EPA notified 3M that it intended to pursue more rigorous regulation of PFAS chemicals. In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

180. In connection with the phase out, 3M issued a press release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

181. 3M worked to control and distort the science on PFAS. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M. Giesy's goal, as expressed in a March 25, 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

182. In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information." 3M was fined $1.52 million for these violations.

183. Despite the large body of research demonstrating the serious health risks posed by PFAS, much of which 3M has been aware of for decades, in November 2018, 3M stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood."

184. In 2022, 3M released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."

185. Also in 2022, 3M announced that it would work to discontinue the use of remaining PFAS across its product portfolio by the end of 2025. Mike Roman, 3M's chairman and chief executive officer at the time, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve." In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."

186. In 2022, 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

187. 3M also publicly stated in 2022: "Global health agencies and researchers acknowledge the limited nature of evidence indicating that PFAS cause harmful effects for specific health endpoints."

188. 3M publicly stated with respect to turnout gear in 2022: "3M is proud of the many ways we apply science to create products that our customers rely on." 3M further stated that "[w]e will continue to vigorously defend our record of responsible use of PFAS and environmental stewardship."

189. In 2022, 3M publicly stated that it makes a "variety of products that are specially engineered to perform in unique challenges firefighters face." 3M further stated that "3M's products are assessed to help assure their safety for their intended uses."

190. In 2025, 3M publicly stated that "the weight of scientific evidence does not show that PFOS or PFOA causes harm to the environment or people at current or historical levels."

191. 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."

192. 3M maintains and publicly advertises: "Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition .... While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions."

**F. DuPont has known for decades of PFAS health and environmental risks.**

193. DuPont was one of the largest chemical companies in the world as measured by sales before it spun off its performance chemicals business to Chemours in 2015.

194. DuPont has known for decades that PFAS exposure is associated with adverse effects on human health, as well as detrimental impacts on the environment but concealed this information from Plaintiffs and the public and continued to market PFAS as safe and appropriate for widespread use.

195. DuPont knew or should have known that, in their intended and/or common use, PFAS and PFAS containing products for use in turnout gear would pose risks to the health, safety, and well-being of firefighters in Illinois.

196. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."

197. In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."

198. As early as the 1960s, DuPont was repeatedly made aware, including through internal research and data, that PFAS were harmful to animals, humans, and the environment.

199. In 1961, DuPont researchers determined that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care." By 1962, in-house experiments confirmed that PFOA was associated with the enlargement of various, specific organs in rats.

200. In 1965, 14 employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, indicating a classic toxicity response to poison.

201. By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

202. In 1978, DuPont alerted employees to the results of a 3M study, which found that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns, including increased rates of endocrine disorders. It did not report this to any government agency.

203. That same year, DuPont's Medical Director, Dr. Bruce Karrh, published an article called "A Company's Duty to Report Health Hazards." In this article, Dr. Karrh stated: "Yes, a company should disclose health-hazard information. It should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go." Dr. Karrh further stated: "From our chairman of the board and the executive committee on down, Du Pont management is committed to make and to use products and chemicals safely, and to inform employees and others of possible health risks when they come to light." He also described DuPont's approach to communications of hazards as follows: "Appropriate groups outside Du Pont, from customers to

government agencies, are notified of potential hazards and actions taken by Du Pont to minimize their impact." He further stated that the "main criteria" for reporting health hazards to others are: "Will this information be useful to these groups? Will it serve to cause these organizations to take remedial action to protect people who might otherwise not be reached? Can these groups disseminate this health-hazard information on a wider scale to provide additional health and safety benefits?" He concluded: "When it comes to our customers, other producers of the same material, and appropriate government agencies, the answer is almost invariably 'yes.'"

204. By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA. That same year, DuPont's survey of employees in its Parkersburg, West Virginia Teflon plant found possible evidence of liver damage in workers exposed to C8 chemicals. Again, it did not report or disseminate any of these results.

205. By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

206. In 1980, DuPont internally "concluded that personnel routinely exposed to C-8 will absorb it in their body." DuPont in 1980 also internally stated that "C-8 will permeate all glove materials over a period of time." At this time, referring to PFOA as C-8, DuPont internally summarized its findings as being that "C-8 is toxic" and "[p]eople accumulate C-8." DuPont stated that its goals were to "reduce exposure" to C-8 and to "reduce organic fluorine in blood," and that this required "[e]quipment changes," among other measures.

207. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

208. By at least the early 1980s, DuPont began considering the effects of PFOA beyond its Washington Works plant.

209. By 1982, Dr. Karrh wrote an internal memorandum where he warned that "there is obviously great potential for current or future exposure of members of the local community from [C8] emissions leaving the plant's perimeter." He recommended that "all available practical steps be taken to reduce this exposure."

210. In 1984, DuPont sent employees to secretly fill jugs of water from gas stations and general stores around the plant. Testing of the water revealed PFOA in Lubeck, West Virginia, and Little Hocking, Ohio. But DuPont decided not to notify the public.

211. In 1984, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA. The corporate managers expressed concern about "C-8 exposures off plant as well as to our customers and the communities in which they operate." The corporate managers admitted internally that "none of the options developed are … economically attractive and would essentially put the long-term viability of this business segment on the line." The DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination" of PFOA but instead decided that "corporate image, and corporate liability" would drive decisions about PFOA. The corporate managers also admitted that it was too late to address past liability: "Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." DuPont did not disclose the

information discussed at the 1984 meeting to EPA, Plaintiffs, or the general public. DuPont began manufacturing PFOA itself over 15 years later and continued to use PFOA for almost another 30 years.

212. By the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

213. In an October 20, 1986 memorandum, a DuPont employee stated that DuPont's management in Wilmington, Delaware was "concerned about the possible liability resulting from long-term C-8 exposure to our employees and to the population in the surrounding communities and those downriver from the [Washington Works] plant."

214. In 1988, DuPont classified PFOA internally within the company as a possible human carcinogen.

215. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

216. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.

217. In 1999, DuPont received preliminary results from a monkey health study showing that C8 caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one was so ill it had to be euthanized.

218. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any

measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

219. That same year, 3M announced that it would stop producing C-8 chemicals. 3M had been DuPont's exclusive supplier of PFOA since the 1950s, so this decision posed a dilemma for DuPont. DuPont chose to begin manufacturing PFOA itself.

220. In April of 2000, DuPont rejected its occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

221. In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

222. In 2001, a class action lawsuit was filed against DuPont on behalf of people in Parkersburg, West Virginia, whose water had been contaminated with PFAS from the nearby DuPont chemical plant where the chemicals were manufactured.

223. Yet, in 2002, DuPont maintained a website titled "C-8 INFORM" which continued to assert that PFOA had no adverse health effects: "In more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical. 3M and DuPont studies, as well as extensive other scientific data, support the position of no known adverse human health effects associated with C-8."

224. In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia. …
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.

225. Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

226. In 2003, Robert Rickard, director of the DuPont Haskell Laboratory for Health & Environmental Sciences, publicly stated: "There is no evidence or data that demonstrates PFOA causes adverse human health effects, including developmental or reproductive effects, in any segment of the human population."

227. Also in 2003, DuPont publicly stated that "PFOA has no known adverse health effects, based on more than 50 years of experience and testing," and that PFOA "does not bioaccumulate, nor is it acutely toxic."

228. DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated

with human exposure to PFOA. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

229. In October 2006, contrary to ERB's advice, DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

230. By December 2005, EPA uncovered evidence that DuPont had concealed the environmental and health effects of C8 for more than two decades. In response, EPA imposed a $16.5 million administrative penalty on DuPont, which at that time was the largest civil administrative penalty EPA had ever obtained under any federal environmental statute.

231. At approximately the time this penalty was issued, DuPont was making approximately $1 billion a year in revenue from products containing C8.

232. Facing increased scrutiny from EPA, DuPont began to gradually phase out PFOA production starting in 2006.

233. In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90 percent of its active litigation to Chemours.

234. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company

where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

235. Notwithstanding DuPont's knowledge of the health and environmental risks of PFAS, DuPont continues to promote PFAS and PFAS-containing products as safe.

236. Chemours maintains and publicly advertises: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintains and publicly advertises that "not all PFAS are the same," and that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."

237. Chemours' current public position is that "[f]luoropolymers . . . are the best solutions for hundreds of important applications in our daily lives."

238. Chemours publicly states today that "[f]luoropolymers possess a unique combination of properties that make them critical to modern life."

239. Chemours has publicly stated in 2026 that "[f]luoropolymers do not pose a significant risk to human health or the environment when used for their intended purpose," and that "[f]luoropolymers do not dissolve or contaminate water, cannot enter or accumulate in a person's bloodstream, and do not pose a significant risk to human health or the environment." Chemours has further stated: "Fluoropolymers are not bio-available, toxic, or even mobile."

240. New DuPont has publicly stated that it "has never manufactured PFOA [or] PFOS," but "does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards." It further stated: "Such uses are necessary

to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society."

241. DuPont continues to assert and advertise to purchasers of its materials that turnout gear manufactured with its materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

**G. Gore has known for decades of PFAS health and environmental risks.**

242. Gore has known for decades of health and environmental risks of PFAS, including PFOA but concealed this information from Plaintiffs and the public and continued to market PFAS as safe and appropriate for widespread use.

243. Gore knew or should have known that, in their intended and/or common use, PFAS and PFAS containing products for use in turnout gear would pose risks to the health, safety, and well-being of firefighters in Illinois.

244. Gore has stated that "[r]esearch has always been a key component of change in the fire industry, with the primary goal of improving the safety and performance of firefighters." Gore has further stated that "[a]fter new research is completed, the industry comes together to consider its impact."

245. Gore has collaborated with DuPont on studies relating to the performance of turnout gear, including in the early 1990s.

246. Jack Hegenbarth was a chemist who started working at Gore in the late 1980s. He previously worked for Old DuPont from the early 1960s through the late 1980s, including on PFAS-related issues for many years.

247. In 1980 while working at Old DuPont, Hegenbarth was copied on a 1980 internal memo that DuPont had found PFAS in its workers' blood.

248. In 1982 while working at Old DuPont, Hegenbarth was copied on an internal 1982 memo that DuPont had found "ammonium perfluorooctanote (C-8) in blood of Teflon® employees." The memo provided information that C-8 was retained in the human body for a long time and stated that C-8 in blood was "anticipated with continued low-level exposure" to C-8.

249. In 1983, Hegenbarth, Dr. Bruce Karrh (Old DuPont's medical director at the time), and others at DuPont were briefed internally on C-8. The meeting notes indicate that "[c]oncern was expressed about" the "fact that C-8 accumulates in the blood." Hegenbarth also was informed that C-8 was in products sold by DuPont.

250. Hegenbarth participated in a 1984 meeting on C-8 at DuPont's corporate headquarters in Wilmington, Delaware at which corporate decisionmakers reached "consensus" that the "issue which will decide future action is one of corporate image, and corporate liability," where "liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." The DuPont corporate executives understood that "legal and medical will most likely take a position of total elimination" of C-8. Hegenbarth and other meeting attendees were provided with information that in 1978 "3M found elevated organic fluorine levels in blood of workers exposed to fluorinated surfactants" and that in 1981 "3M advised that C-8 caused birth defects in the unborn when fed by stomach tube to female rats." DuPont stated at this time that "[a]ll female employees with potential C-8 exposure were promptly transferred to other plant areas." In or around this time, DuPont had set C-8 exposure limits for air based upon "liver changes seen in rats." Information provided at the meeting recounted that DuPont had established a policy in

1980 to "[r]educe exposure [to C-8] by engineering controls and protective equipment so that elevated organic fluorine levels in blood will decrease and accumulation of organic fluorides in new workers will be limited." The meeting information also stated that C-8 is "toxic" and that it "has an estimated biological half life of two years in human blood."

251. Richard Baillie worked at Gore from 1996 through 2008, with responsibilities including the global procurement of fluoropolymers, and was the chairman of the fluoropolymers division of the Society of the Plastics Industry and had a "[k]ey role for understanding and dealing with PFOA issue." Baillie previously worked as a Global Business Leader at Old DuPont from 1980 through 1996 and worked in fluoropolymers, research and development, sales and marketing, manufacturing leadership and business leadership roles.

252. Baillie has stated that "[m]y life's work has been in the fluoropolymer industry with a broad experience base including: R&D, sales, manufacturing leadership, procurement, new business development, distribution, business leadership and board of directors," that he has "worked with many products including: PTFE (granular, fine powder, dispersion and micropowder), FEP, PFA, ETFE, FKM, FFKM, polyimide and films," and that the "product where I have the deepest level of expertise is PTFE fine powder." Baillie further stated: "I have been active in the Fluoropolymers division (FPD), our industry trade association, where I am a past chairman and am currently on the executive committee and have been active at the Society of Plastics Industry (SPI) board meetings. I have a broad and deep understanding of the PFOA issue including; developing, evaluating and qualifying replacement products and legacy liability issues."

253. In 1994 while at Old DuPont, Baillie was sent a copy of DuPont's internal "C-8 Ammonium Perfluorooctanoate Fluorosurfactant, Strategies and Plans" document labeled as

confidential and was directed to return an earlier draft of the C-8 paper "for destruction." The DuPont internal plan stated that "C-8 is mostly unaffected by the manufacturing processes. This results i[n] most of the C-8 ending up a part of our product (dispersions) or as a waste to the environment." The plan stated that the "use of C-8 and C-8 containing products" should be managed "in a way that exposure to employees and customers" is "within accepted control levels." The plan further stated that the "slow clearance of C-8 from human blood justifies the setting of a low permissible exposure" and that there is a "long half-life of C-8 in the human blood system."

254. The 1994 internal plan recounted that DuPont had been searching for C-8 replacements since 1979. It also identified Gore as a DuPont customer for C-8 containing products. The plan attached an earlier DuPont internal memo from 1990 which concluded that there "is a correlation between C-8 personnel air levels and C-8 in blood levels, and between skin contact and C-8 in blood levels." The 1990 DuPont internal memo also concluded that the "[d]rop-off rate for C-8 in the blood is a half life of ~4-5 years or more." The 1994 plan also attached another earlier DuPont internal memo that stated that the "concern around the long term effects of ammonium perfluorooctanoate is related to its persistence in human blood" and found toxic effects to the liver and benign testicular cancers based upon animal studies.

255. Gore claims to have removed some PFAS from its supply chain in 2013. In a press release announcing this, Gore publicly stated: "GORE products have always been environmentally friendly and safe for consumers, even before PFOA had been eliminated from the raw material."

256. Notwithstanding Gore's knowledge of the health risks of PFAS, in 2019, Gore issued a public statement by its toxicologist Dr. Barbara J. Henry claiming that "the potential

exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant." Gore also publicly stated through Dr. Henry at the same time that the "potential exposures and associated risks of cancer effects from PFOA are insignificant."

257. In 2021, Gore publicly stated that it remained confident in the safety of its products for use in firefighter turnout gear.

258. In 2021, Gore further publicly stated that "Gore is confident in the safety and performance of our technical firefighting products." Gore publicly denounced that "PTFE causes cancer in firefighters. This is not the case."

259. In 2021, Gore publicly stated: "Based on our review of available science, Gore concludes its firefighting products are not the cause of cancers impacting firefighters."

260. In 2021, Gore also publicly stated that its turnout gear products that used PFAS were safe: "Gore uses ePTFE (an expanded form of PTFE) for the thin waterproof and breathable membranes at the heart of all of our GORE® moisture barrier products for the firefighting industry. PTFE is a member of the fluoropolymer class of per-and polyfluorinated alkyl substances (PFAS) and it is broadly recognized as safe for products of high societal value, including implantable medical devices." Gore assured the public that its turnout gear products made with PTFE were safe: "For 40 years, PTFE has proven to be a safe and reliable material for moisture barriers because its chemical and physical properties enable it to withstand exposure to high temperatures and protect against a wide range of biological contaminants and harsh substances. PTFE is extremely durable, flexible, and thermally stable, making it well suited to withstand the exceptional physical rigors of the job and maintain its performance for many years."

261. At this time, Gore publicly stated that proposals to change turnout gear specifications "cast unnecessary and inappropriate doubt upon the safety of PTFE, a PFAS material used in Gore's moisture barriers. Should the [proposal] proceed based on the included substantiations, an unintended consequence may be actually limiting the choices that firefighters should have to select highest performance materials helping to protect them against many hazards faced on the job. Gore supports innovation and exploration of alternative technologies and material sets as well as a robust science-based challenge to current understandings to advance firefighter safety. Gore is honored and proud to serve the firefighting community with safe and effective first in class components for turnout gear, and we rely on the body of available and relevant science to refute any claims that PTFE causes cancer in firefighters."

262. In 2021, Gore also publicly stated:

> "For 40 years, Gore has been continuously researching, developing and manufacturing a portfolio of products for firefighters — to offer the best range of products we can, to enable firefighters to do their jobs safely and effectively.
>
> As a material science company, Gore carefully selects materials most appropriate for the unique specifications of each product and end use application.
>
> We follow the developing science, do our own extensive internal testing and invest in independent research to develop high performing products that meet or exceed the applicable performance and safety standards in the geographies where our products are sold. We are committed to innovation and seek continuous improvement in our products to meet the needs of firefighters and comply with the appropriate industry standards."

263. Gore further publicly stated in 2021: "The chemical and physical properties of PTFE make it ideal for use in demanding applications with harsh conditions such as structural firefighting."

264. Gore asserts that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."

In promoting its use of PTFE including in turnout gear, Gore asserts that "fluoropolymers satisfy widely accepted assessment criteria to be considered as 'polymers of low concern' (PLC) and to show that fluoropolymers are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes."

265. In 2021, Gore maintained in a *New York Times* article that its turnout gear products were safe for users.

266. In 2023, Gore gave a presentation attempting to justify its continued use of PTFE and asserted that "PTFE does not have hazards. . . therefore PTFE has no threshold for adverse effects to exceed."

267. Gore's website currently states: "Historically, residual PFOA could be measured in some of our fabrics at trace levels, though the products were safe for their intended use."

268. Gore's website also currently states that "PTFE is non-toxic and safe for the end user."

269. Gore's website currently further states: "Previously, PFOA residuals could be measured at trace levels in the raw material used to produce PTFE membranes. The PFOA residuals did not affect the base properties of raw materials used by Gore nor the safety and performance of our products."

### H. Globe has known or should have known of PFAS health and environmental risks.

270. Globe knew or should have known that, in their intended and/or common use, turnout gear containing PFAS would pose risks to the health, safety, and well-being of firefighters in Illinois but concealed this information from Plaintiffs and the public and continued to market its turnout gear containing PFAS as safe and appropriate for widespread use.

271. Globe touts itself as having "invented turnout gear over 130 years ago" and

markets itself as the most trusted brand: "Today we still deliver the most advanced, best-fitting, and longest-lasting protection by listening to our customers, creating breakthrough designs, and applying the engineering skills of the nation's most trusted manufacturer."

272. Globe has held itself out as having been "committed to meeting the evolving needs of firefighters by delivering high-quality, high-performance turnout gear built from state-of-the-art materials" for over 130 years.

273. In 1953, Globe was the first to use 3M™ SCOTCHLITE™ reflective trim for its turnout gear.

274. In 1966, Globe introduced DuPont NOMEX® fabric for its turnout gear.

275. In 1985, Globe introduced Gore-Tex® fabric for the moisture barriers in its turnout gear.

276. In 2003, Globe launched G-XTREME®, which it described as "the world's most advanced turnout gear."

277. In or around 2022, Globe publicly stated that its turnout gear was safe: "PFAS are a large class of substances that are widely used in everyday products. Specifically, Globe builds turnout gear from technical fabrics sourced from a small pool of specialty textile manufacturers. These protective fabrics have been tested and certified to meet industry standards, and some of them contain PFAS to achieve water, oil, or chemical resistance."

278. Since Globe has made turnout gear for many decades, including with products containing PFAS from 3M, DuPont, and Gore, and has held itself out as a leader in research and development, Globe on information and belief knew, or at the very least should have known, of the risks of PFAS contained in its turnout gear products.

**I. Lakeland has known or should have known of PFAS health and environmental risks.**

279. Lakeland knew or should have known that, in their intended and/or common use, turnout gear containing PFAS would pose risks to the health, safety, and well-being of firefighters in Illinois but concealed this information from Plaintiffs and the public and continued to market its turnout gear containing PFAS as safe and appropriate for widespread use.

280. In 1986, Lakeland expanded into the fire service market "focusing on firefighter protective apparel" and began manufacturing, marketing, and selling turnout gear. Lakeland has described this 1986 expansion as a "defining moment in Lakeland's history" and stated: "From those early days, one thing has always stayed the same: our mission to protect your people. Whether its firefighters battling the flames or workers in hazardous environments, we've been committed to safety every step of the way."

281. Lakeland for many years has manufactured, marketed, and sold turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, and Stedair.

282. Lakeland has publicly touted that it brought together industry experts to provide "quality protective solutions":

> "Our Mission: To protect the world's workers, first responders, and communities by providing quality protective solutions for the most critical situations.
>
> For over forty years, Lakeland Fire + Safety has provided quality protective solutions for the most critical applications, answering the call to protect the world's workers, first responders, and communities.
>
> Every Lakeland team member is joined in our pursuit of a noble mission: Protecting Your People.
>
> We're proud to offer a platform for innovative designers, developers, and industry

> experts as they lead the charge to shape global worker safety.
>
> Lakeland Fire + Safety is proud to partner with a global network of select distribution partners who help support our field sales and customer service teams in bringing PPE to the global workforce. Whether you're looking to evaluate your current safety program, compare garments, schedule a site visit, check your order status, or learn more about the Lakeland mission, our team is ready to assist you!"

283. Lakeland has publicly stated that a "[k]ey element[] of our corporate strategy" includes "[b]uilding a premier global firefighter safety brand through product and marketing enhancements."

284. Lakeland has held itself out publicly as a "global leader in the manufacturing of protective clothing to help improve the quality of safety" for those working in "fire services."

285. Lakeland has publicly stated that "[f]or over 40 years, Lakeland Fire + Safety has set the standard in protective gear – delivering advanced, reliable PPE that keeps firefighters and first responders safe in every situation."

286. Lakeland has publicly stated that its turnout gear products are safe and that "trace amounts" of PFAS in its products "do not affect the safety or performance of the product."

287. Since Lakeland has made turnout gear for many decades, including with products containing PFAS from 3M, DuPont, and Gore, and has held itself out as a leader in research and development, Lakeland on information and belief knew, or at the very least should have known, of the risks of PFAS contained in its turnout gear products.

### J. Other companies that have used 3M, DuPont, and Gore's PFAS or PFAS-containing products in their turnout gear also publicly promote their turnout gear products as safe.

288. Lion has manufactured turnout gear that contains PFAS. Lion's President, Stephen Schwartz, wrote a letter to the editor of The Columbus Dispatch in 2017, stating that turnout gear containing PFAS was safe: "PFOAs and PFOSs have never been components of

Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish … . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts … would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear. … Firefighters are not in direct skin contact with the moisture barriers while wearing their gear, and experience only a small degree of direct skin contact with the water repellent finishes when wearing and handling their turn out gear. Thus, even if trace amounts of PFOA residue existed on these finishes, exposure would be minimal. . . We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks …. However, the elevated risks derives from the hazardous substances produced by the fire, not the turnout gear that protects firefighters."

289. In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," that publicly re-affirmed that its gear was safe: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

290. In 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, purchased a full page in Firefighter Nation to promote turnout gear containing PFAS as safe: "The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no

credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population … At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress."

291. In 2021, Lion confirmed that Chrostowski's representations reflect the company's position.

**K. Defendants' conduct had a substantial effect on interstate and intrastate commerce.**

292. Defendants' conduct as alleged herein has had a substantial effect on both interstate and intrastate commerce. At all material times, Defendants participated in the manufacture, marketing, promotion, distribution, and sale of substantial amounts of turnout gear containing PFAS in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States. Defendants' conduct also had significant intrastate effects, as turnout gear containing PFAS was advertised and sold in Illinois, impacting at least tens of thousands of individuals in Illinois. As a direct result of Defendants' conduct, Plaintiffs and class members in Illinois purchased turnout gear products containing PFAS that they otherwise would not have purchased or paid more for such products than they would have absent such unlawful conduct.

**L. 3M, DuPont, Gore, Globe, and Lakeland Failed to Provide Safety Warnings including on Product Labels.**

293. Despite their knowledge that PFAS pose health and environmental risks, and despite the availability of reasonable PFAS-free alternatives for turnout gear, 3M, DuPont, Gore, Globe, and Lakeland failed to warn Plaintiffs and class members. Instead, 3M, DuPont, Gore, Globe, and Lakeland promoted PFAS, products containing PFAS for use in turnout gear and turnout gear containing PFAS, as safe and suitable for the protection of the health, safety, and physical well-being of firefighters who use it.

294. At all times relevant to this litigation, 3M, DuPont, Gore, Globe, and Lakeland knew or should have known that PFAS and products containing PFAS for use in turnout gear posed risks to human health.

295. 3M, DuPont, Gore, Globe, and Lakeland possess and have always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Plaintiffs and the class members, concerning the manufacture, distribution, nature, and properties of PFAS and PFAS-containing products, including for use in turnout gear and turning gear containing PFAS.

296. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as chemists, engineers, toxicologists, and other researchers, 3M, DuPont, Gore, Globe, and Lakeland have at all relevant times been in a position to know, identify, and confirm the threat PFAS in turnout gear posed and poses to firefighters.

297. 3M, DuPont, Gore, Globe, and Lakeland had a duty to disclose the truth about PFAS given their superior knowledge and given their partial and incorrect statements regarding the nature and impacts of PFAS for use in turnout gear.

298. As alleged above, the turnout gear does not contain or display any adequate label, information or warnings, including:

a. that the gear contains or may contain PFAS,

b. that the gear specifically contains or may specifically contain PFOA,

c. the health risks associated with exposure to PFAS, or

d. the health risks associated with exposure to PFOA.

299. Defendants have marketed their turnout gear products as meeting the highest design and material standards and as safe and suitable for the protection of the health, safety, and physical well-being of firefighters who will use them.

**M. It was technologically and economically feasible for Defendants to design safer turnout gear at all relevant times.**

300. PFAS-free turnout gear was, at all relevant times, technologically and economically feasible.

301. Any increased cost of alternatives to PFAS would not make the product economically infeasible – just less profitable for Defendants that had a goal of maximizing revenue despite potential (and known) health and environmental risks posed by their products.

302. Some companies now offer PFAS-free turnout gear, including options for PFAS-free waterproof fabrics, durable fabrics, and outer shells in turnout gear. A safer alternative design is, and has been, economically and technologically feasible at all relevant times.

303. In or around 2021, Gore announced it would be launching its new PFAS-free fabric-waterproofing technology, which was lauded for its potential to "greatly increase the availability of PFAS-free water repellant garments."

304. In or around 2021, Todd Herring, Vice President of Product Innovation and Strategy at Fire-Dex, another turnout gear manufacturer, published a press release stating that the

company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials … that meets the increasing market demand for PFAS free PPE material options."

305. Fire-Dex now offers a non-fluorinated moisture barrier, "Stedair® CLEAR™ from Stedfast," which is "constructed of a Nomex woven pajama check laminated to a non-fluorinated barrier with a highly engineered polymer coating designed for performance and durability."

306. In discussing this new product, Herring stated: "By introducing this non-fluorinated option, firefighters can now make the choice that is right for their department."

## V. CLASS ALLEGATIONS

307. Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a class defined as follows:

> All entities in Illinois that bought turnout gear that contained PFAS that was manufactured, designed, distributed, applied, used, marketed, and/or sold, in whole or in part, by any of the Defendants within the relevant time period.

308. Plaintiffs reserve the right to expand, narrow, or otherwise modify or refine the definition of the class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

309. Excluded from the class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the class; (d) persons whose claims in this matter have been

finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

310. **Ascertainability**. The proposed class is readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the class. Further, the members of the class can be readily identified through records and information in Defendants' possession, custody, or control.

311. **Numerosity**. The class is so numerous that joinder of individual members is impracticable. While the exact number of members of the class is not known to Plaintiffs at this time and can only be determined through appropriate discovery, Plaintiffs believe that there are over 1,100 class members.

312. **Commonality and Predominance**. Common questions of fact and law exist for each cause of action and these common questions, facts and evidence predominate over questions solely affecting individual members of the class, including but not limited to the following:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants manufactured, designed, advertised, marketed, distributed, sold, or otherwise used PFAS and PFAS-containing products in turnout gear purchased in Illinois;

c. Whether Defendants knew about the dangers of PFAS and, if so, for how long they have known of such dangers;

d. Whether a safer alternative design was feasible;

e. Whether Defendants breached their duty to warn the members of the class of, and protect the members of the class from, the health risks associated with exposure to PFAS through the use of turnout gear;

f. Whether Defendants violated applicable state laws;

g. Whether Defendants violated and are liable under RICO;

h. Whether there is an enterprise within the meaning of RICO and whether Defendants participated in the enterprise;

i. Whether Plaintiffs and the other class members are entitled to injunctive or declaratory relief; and

j. Whether Plaintiffs and the other class members are entitled to damages and other monetary relief and, if so, in what amount.

313. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and members of the class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiffs and members of the class were directly caused by Defendants' wrongful conduct, and Plaintiffs and members of the class assert similar claims for relief.

314. **Adequacy**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the class, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the class.

315. **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the class is impracticable. This proposed class action is manageable. Plaintiff knows of no special difficulty likely to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

316. Plaintiffs, on behalf of themselves and the proposed class, respectfully request that the Court determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), direct that reasonable notice of this action be given to the class, declare Plaintiffs as the named representatives of the class, and appoint Plaintiffs' counsel as class counsel.

## VI. DISCOVERY RULE TOLLING

317. For decades, Defendants have known about the risks and hazards to the health and safety of firefighters working for Plaintiffs and class members caused by exposure to PFAS chemicals as discussed above.

318. For example, as alleged above, 3M and DuPont beginning in the 1950s conducted internal studies that demonstrated that PFAS chemicals are toxic. Gore has manufactured ePTFE for use in turnout gear for decades and has known of the health and environmental risks by posed by PFAS since at least the late 1980s. Globe and Lakeland have manufactured turnout gear for decades, promoted their research and development of turnout gear products and promoted turnout gear containing PFAS for many years.

319. Defendants knew or should have known that their PFAS or PFAS-containing products posed risks to the health, safety, and well-being of firefighters working for Plaintiffs

and class members, and that the turnout gear containing PFAS was not fit for its ordinary purpose or its intended purpose due to these risks.

320. Defendants intentionally concealed their conduct and the existence of the claims alleged in this complaint from Plaintiffs and class members for decades.

321. Defendants intentionally and continuously misrepresented the safety of the turnout gear containing PFAS and PFAS-containing products and PFAS for use in turnout gear, but instead promoted their products to Plaintiffs, class members, and the public as safe and appropriate for their intended uses.

322. At all relevant times, Defendants concealed that PFAS was contained in the turnout gear purchased by Plaintiffs and class members that posed risks to human health even though Defendants knew of the risks of PFAS contained within the turnout gear products.

323. Plaintiffs and class members could not have reasonably discovered the claims alleged in this complaint because of Defendants' ongoing concealment that PFAS contained in the turnout gear posed risks to human health, and that it posed unique dangers to firefighters using the PFAS-containing turnout gear. Plaintiffs and class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein

324. If Plaintiffs and the class members had been adequately informed of the presence of PFAS in turnout gear products that poses risks to the health, safety, and well-being of firefighters who would be exposed to these PFAS chemicals in turnout gear, they would not have purchased Defendants' products and/or would have paid less for them.

325. For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the class members.

## VII. FRAUDULENT CONCEALMENT TOLLING

326. For decades, Defendants intentionally concealed their conduct and the existence of the claims asserted herein from Plaintiffs and class members.

327. Plaintiffs and class members could not have reasonably discovered the claims alleged in this complaint because of Defendants' ongoing concealment that PFAS contained in the turnout gear posed risks to human health, and that it posed unique dangers to firefighters using the PFAS containing turnout gear.

328. For these reasons, applicable limitations of actions and claims alleged in this complaint or any statute of limitations that otherwise may apply to the claims of Plaintiffs or class members have been tolled.

## VIII. CLAIMS ON BEHALF OF PLAINTIFFS AND ALL CLASS MEMBERS

### COUNT I
### Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1962(c), (d)

329. Plaintiffs and class members re-allege and incorporate the allegations within all prior paragraphs of this Complaint as if they were fully set forth herein.

330. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

331. All Defendants are "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

332. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate any of the provisions of subsection … (c) of this section."

333. For many years, each of the Defendants created and/or participated in the affairs of an illegal enterprise (the "PFAS Concealment Enterprise" or "Enterprise") whose purpose was to conceal the dangers of their PFAS products, including PFAS-containing turnout gear sold to Plaintiffs and class members. As further set forth below, the acts of Defendants in furtherance of the PFAS Concealment Enterprise violate sections 1962(c) and (d).

**A. The PFAS Concealment Enterprise.**

334. All Defendants are members of the PFAS Concealment Enterprise.

335. The Defendants engaged in a scheme and common course of conduct to conceal the dangers of PFAS, deceive the public and consumers, and have entities purchase turnout gear products that the PFAS Concealment Enterprise members knew contained PFAS that posed risks to human health, all while knowing that such PFAS rendered the Defendants' products unsuitable for ordinary and intended purposes and reduced or eliminated the value of such products.

336. The Enterprise benefitted from concealment of the dangers of PFAS, including as follows. First, 3M, DuPont, and Gore made other products that contain PFAS. To disclose the dangers of PFAS in turnout gear would have raised concerns about the safety of other products they manufactured. Second, 3M, DuPont, Gore, Globe, and Lakeland were facing increasing and substantial potential liability for environmental and other damage caused by the manufacture of PFAS and PFAS-containing products in the United States and other countries and concealed the dangers of PFAS in firefighter gear to avoid increasing their liability for other products. Third, if 3M, DuPont, Gore, Globe, and Lakeland had disclosed the dangers caused by PFAS in firefighter gear, other firms would have competed far earlier to develop PFAS-free firefighter gear.

337. 3M had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise including by:

a. Manufacturing, distributing, marketing, and selling PFAS and PFAS-containing products for use in firefighter turnout gear purchased by Plaintiffs and class members;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS in firefighter turnout gear to Plaintiffs and class members, and the public generally;

c. Introducing PFAS and PFAS-containing products for use in firefighter turnout gear into the stream of U.S. commerce;

d. Concealing from Plaintiffs, class members, and the public the truth about the dangers of PFAS in PFAS-containing firefighter gear;

e. Continuing to manufacture, distribute, market, and sell PFAS and PFAS-containing products for use in turnout gear despite knowing about the dangers of PFAS; and

f. Designing, distributing, and/or making marketing statements that misrepresented and concealed the truth about the dangers of PFAS used in firefighter turnout gear.

338. DuPont had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise including by:

a. Manufacturing, distributing, marketing, and selling PFAS and PFAS-containing products for use in firefighter turnout gear purchased by Plaintiffs and class members;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS in firefighter turnout gear to Plaintiffs and class members, and the public generally;

c. Introducing PFAS and PFAS-containing products for use in firefighter turnout gear into the stream of U.S. commerce;

d. Concealing from Plaintiffs, class members, and the public the truth about the dangers of PFAS in PFAS-containing firefighter gear;

e. Continuing to manufacture, distribute, market, and sell PFAS and PFAS-containing products for use in turnout gear despite knowing about the dangers of PFAS; and

f. Designing, distributing, and/or making marketing statements that misrepresented and concealed the truth about the dangers of PFAS used in firefighter turnout gear.

339. Gore had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise including by:

a. Manufacturing, distributing, marketing, and selling PFAS and PFAS-containing products for use in firefighter turnout gear purchased by Plaintiffs and class members;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS in firefighter turnout gear to Plaintiffs and class members, and the public generally;

c. Introducing PFAS and PFAS-containing products for use in firefighter turnout gear into the stream of U.S. commerce;

d. Concealing from Plaintiffs, class members, and the public the truth about the dangers of PFAS in PFAS-containing firefighter gear;

e. Continuing to manufacture, distribute, market, and sell PFAS and PFAS-containing products for use in turnout gear despite knowing about the dangers of PFAS; and

f. Designing, distributing, and/or making marketing statements that misrepresented and concealed the truth about the dangers of PFAS used in firefighter turnout gear.

340. Globe had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise including by:

a. Manufacturing, distributing, marketing, and selling firefighter turnout gear containing PFAS purchased by Plaintiffs and class members;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS in firefighter turnout gear to Plaintiffs and class members, and the public generally;

c. Introducing firefighter turnout gear containing PFAS into the stream of U.S. commerce;

d. Concealing from Plaintiffs, class members, and the public the truth about the dangers of PFAS in PFAS-containing firefighter gear;

e. Continuing to manufacture, distribute, market, and sell firefighter turnout gear containing PFAS despite knowing about the dangers of PFAS; and

f. Designing, distributing, and/or making marketing statements that misrepresented and concealed the truth about the dangers of PFAS used in firefighter turnout gear.

341. Lakeland had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise including by:

a. Manufacturing, distributing, marketing, and selling firefighter turnout gear containing PFAS purchased by Plaintiffs and class members;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS in firefighter turnout gear to Plaintiffs and class members, and the public generally;

c. Introducing firefighter turnout gear containing PFAS into the stream of U.S. commerce;

d. Concealing from Plaintiffs, class members, and the public the truth about the dangers of PFAS in PFAS-containing firefighter gear;

e. Continuing to manufacture, distribute, market, and sell firefighter turnout gear containing PFAS despite knowing about the dangers of PFAS; and

f. Designing, distributing, and/or making marketing statements that misrepresented and concealed the truth about the dangers of PFAS used in firefighter turnout gear.

342. All members of the PFAS Concealment Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications which information is not fully available to Plaintiffs because it is in Defendants' and others' possession.

343. All members of the PFAS Concealment Enterprise served the common purpose of concealing the dangers of PFAS and PFAS-containing products for use in turnout gear from Plaintiffs and class members, and the public generally. Each member of the PFAS Concealment Enterprise shared in the benefits of the PFAS Concealment Enterprise by continuing to sell PFAS and PFAS-containing products or turnout gear containing PFAS for decades when they knew that PFAS posed significant dangers and that sales would be negatively impacted if those dangers were disclosed.

**B. The Predicate Acts**

344. To carry out or attempt to carry out the scheme to defraud, the members of the PFAS Concealment Enterprise conducted or participated in the conduct of the affairs of that Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

345. Specifically, the members of the PFAS Concealment Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

346. The PFAS Concealment Enterprise members' use of the mails and wires include but are not limited to the transmission, delivery, or shipment of the following by the members or third parties that were foreseeably caused to be sent as a result of the PFAS Concealment Enterprise members' illegal scheme:

a. Turnout gear products containing PFAS to purchasers;

b. Documents and communications accompanying the shipments of turnout gear products containing PFAS to purchasers;

c. False or misleading Material Safety Data Sheets, Safety Data Sheets, Technical Data Sheets, and product labels;

d. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the risks including to human health of PFAS used in firefighter turnout gear products;

e. Documents intended to facilitate the manufacture and sale of PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS, including invoices, shipping records, reports and correspondence;

f. Documents to process and receive payment for PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS, including invoices and receipts;

g. Payments to the PFAS Concealment Enterprise members for PFAS and PFAS-containing products for use in turnout gear and PFAS-containing turnout gear;

h. Deposits of proceeds from sales of PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS by PFAS Concealment Enterprise members; and

i. Other documents and things, including electronic communications.

347. The PFAS Concealment Enterprise members utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

348. The PFAS Concealment Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

349. The mail and wire transmissions described herein were made in furtherance of the PFAS Concealment Enterprise members' scheme and common course of conduct to deceive the public and consumers and have customers purchase turnout gear containing PFAS that the PFAS Concealment Enterprise members knew contained PFAS.

350. Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the PFAS Concealment Enterprise members' books and records. But Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs. Upon information and belief, at least two of these predicate acts happened within the last ten years, including because 3M, DuPont, and Gore manufactured, marketed, and sold PFAS and PFAS containing products for use in turnout gear within the last ten years and Globe and Lakeland manufactured, marketed, and sold turnout gear containing PFAS within the last ten years.

351. The PFAS Concealment Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Concealment Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the PFAS Concealment Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the PFAS Concealment Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

352. The PFAS Concealment Enterprise members aided and abetted others in the violations of the above laws and violated 18 U.S.C. §§ 1341 and 1343.

353. To achieve their common goals, the PFAS Concealment Enterprise members hid from the general public, purchasers of firefighter turnout gear, and others the dangers of PFAS.

354. The PFAS Concealment Enterprise members, with knowledge and intent, have agreed to the overall objectives of the PFAS Concealment Enterprise and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling turnout gear that contained PFAS to municipalities, fire departments, and other similar entities including the Plaintiffs and class members.

355. The PFAS Concealment Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiffs and the Class members were harmed as a result of the PFAS Concealment Enterprise members' intentional conduct. Plaintiffs and the class members, among others, relied on the PFAS Concealment Enterprise members' material misrepresentations and omissions.

356. As described herein, the PFAS Concealment Enterprise members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and class members and obtaining significant monies and revenues from them and through them while providing turnout gear containing PFAS to Plaintiffs and class members. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

357. The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Concealment Enterprise members at the expense of Plaintiffs and class members. The predicate acts were committed or caused to be committed by the PFAS Concealment Enterprise members through their participation in the PFAS Concealment Enterprise and in furtherance of its fraudulent scheme.

358. The PFAS Concealment Enterprise members had a duty to disclose the truth about the dangers of turnout gear containing PFAS to Plaintiffs and class members but never did so.

359. The PFAS Concealment Enterprise members' violations of 18 U.S.C. §§ 1962(c) and (d) have directly and proximately caused damages to Plaintiffs and class members, all of whom are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each member of the PFAS Concealment Enterprise knew, understood, and intended for Plaintiffs and class members to purchase PFAS-containing turnout gear knowing that the PFAS in the turnout gear posed human health and other risks to firefighters working for Plaintiffs and class members. As a result of the conduct of the Enterprise, Plaintiffs and class members overpaid for turnout gear, purchased certain turnout gear when they otherwise would not have done so, and/or were deprived of the ability to buy PFAS-free turnout gear.

360. WHEREFORE, Plaintiffs and class members respectfully request that the Court enter judgment in their favor and against Defendants and award relief including: (a) threefold the damages sustained by the Plaintiffs and class members in an amount to be determined at trial, together with pre- and post-judgment interest as provided by law; (b) such equitable and injunctive relief as may be available pursuant to 18 U.S.C. § 1964(a) to enjoin Defendants from continuing the unlawful acts, practices, and schemes alleged herein; (c) disgorgement, restitution,

and other equitable monetary relief to the extent available; (d) reasonable attorneys' fees, costs, and expenses of litigation as provided by 18 U.S.C. § 1964(c); (e) certification of this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as class representatives and their counsel as class counsel; and (f) such other and further relief as the Court deems just and proper.

**COUNT II**
**Civil conspiracy**

361. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

362. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

363. Upon information and belief, Defendants knowingly and intentionally conspired to engage in the wrongful conduct alleged in each Count under State law set forth below.

364. As alleged in the Complaint, Defendants engaged in underlying unlawful and tortious acts, including designing, manufacturing, marketing, and selling PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS while concealing the risks of PFAS from Plaintiffs and class members and promoting PFAS and turnout gear containing PFAS as suitable for the protection of the health, safety, and physical well-being of firefighters, and acted in concert and in furtherance of a common design or agreement.

365. Defendants engaged in unlawful and/or lawful conduct to achieve an unlawful object, including to sell their products and increase their revenues by misrepresenting and omitting material facts about the risks posed by PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS.

366. Defendants engaged in unlawful means to accomplish a lawful object, including by misrepresenting and omitting material facts about the risks posed by PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS in order to sell their products and increase their revenues.

367. Defendants agreed on the object or course of action.

368. Defendants each engaged in one or more unlawful overt acts, including misrepresenting and omitting material facts about the risks posed by PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS.

369. Defendants' conduct directly and proximately caused damage to Plaintiffs and class members, including economic costs of turnout gear containing PFAS that they would not have purchased, would have paid less for, and/or need to replace.

370. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products containing PFAS or purchased Defendants' turnout gear products containing PFAS when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT III**
**Breach of express warranty**
**(810 ILCS 5/2-313)**

371. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

372. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

373. Pursuant to 810 ILCS 5/2-313:

> (1) Express warranties by the seller are created as follows:
>
> > (a) Any affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain creates an express warranty that the good shall conform to the affirmation or promise.
> >
> > (b) Any description of the good which is made part of the basis of the bargain creates an express warranty that the good shall conform to the description....
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have specific intention to make a warrant.

374. Defendants provided Plaintiffs and class members with written and unwritten express warranties, including but not limited to warranties that PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS were safe, and were suitable for the protection of the health, safety, and physical well-being of firefighters.

375. These representations became a basis of the bargain between Defendants and the Plaintiffs and class members.

376. Defendants breached these warranties resulting in damages to Plaintiffs and class members who purchased Defendants' products, which did not have the purported benefits.

377. Plaintiffs complied with the terms of the express warranty, and demanded Defendants fulfill its terms, and provided notice to Defendants within a reasonable time upon discovering their breach of this express warranty.

378. As a direct and proximate result of the breach of warranties by Defendants, Plaintiffs and class members have suffered damages in an amount to be determined at trial in

that, among other things, they purchased and paid for products that did not conform to what was promised and promoted, marketed, and advertised by Defendants, and they were deprived of the benefit of their bargain and spent money on products that did not have the purported benefits or value or had less purported benefits or value than warranted, or on products that they would not otherwise have purchased.

379. Defendants' motive of increasing profits at the expense of risks to human health posed by turnout gear purchased by Plaintiffs and the class members was morally wrong and Defendants' conduct showed a reckless disregard of the rights of Plaintiffs and class members.

380. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products containing PFAS or purchased Defendants' turnout gear products containing PFAS when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT IV**
**Breach of Implied Warranty of Merchantability**
**(810 ILCS 5/2-314)**

381. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

382. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

383. Pursuant to 810 ILCS 5/2-314:

> (1) Unless excluded or modified (Section 2-316 [810 ILCS 5/2-316]), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as
>
> > (a) pass without objection in the trade under the contract description; and
> > (b) in the case of fungible goods, are of fair average quality within the description; and
> >
> > (c) are fit for the ordinary purposes for which such goods are used; and
> >
> > (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> >
> > (e) are adequately contained, packaged, and labeled as the agreement may require; and
> >
> > (f) conform to the promises or affirmations of fact made on the container or label if any.
>
> (3) Unless excluded or modified (Section 2-316 [810 ILCS 5/2-316]) other implied warranties may arise from course of dealing or usage of trade.

384. Defendants' products came with an implied warranty that they were merchantable and fit for the ordinary purposes for which such products are purchased and used. Defendants breached the warranty implied at the time of sale in that Plaintiffs and class members did not receive products with the purported benefits and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, and advertised, or sold.

385. Defendants breached the implied warranty of merchantability because, among

other things, their products were not in a merchantable condition when sold; were not fit for the ordinary purposes for which such products are used; were defective when sold; contained toxic PFAS chemicals; posed a risk of exposure to toxic PFAS chemicals; lacked adequate warnings or instructions regarding the risks and dangers posed by PFAS further rendering such products unreasonably dangerous and unfit for purchase or ordinary purposes; were not fit for the protection of the safety, health, and physical well-being of firefighters; and require limitations on use, and the discontinuation of use, to limit potential exposure to toxic chemicals.

386. Plaintiffs and class members have had sufficient direct dealings with Defendants to establish privity of contract between Defendants, on the one hand, and Plaintiffs and class members, on the other hand.

387. Plaintiffs and class members provided Defendants with notice of the breach of this implied warranty within a reasonable time after discovering, or when they should have discovered, the above-mentioned breaches.

388. As a direct and proximate result of the breach of warranties by Defendants, Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, Plaintiffs purchased and paid for products that were not merchantable, that were not fit for the ordinary purposes for which such products are used, and that did not conform to what was promised, promoted, marketed, and advertised by Defendants. Plaintiffs were thereby deprived of the benefit of their bargain and purchased products that did not have warranted benefits or value or had less benefits or value than warranted or that they would not otherwise have purchased.

389. Defendants' motive of increasing profits at the expense of risks to human health posed by turnout gear purchased by Plaintiffs and the class members was morally wrong and

Defendants' conduct showed a reckless disregard of the rights of Plaintiffs and class members.

390. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products containing PFAS or purchased Defendants' turnout gear products containing PFAS when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT V**
**Breach of Implied Warranty of Fitness for a Particular Purpose**
**(810 ILCS 5/2-315)**

391. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

392. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

393. Pursuant to 810 ILCS 5/2-315:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

394. The Defendants' products were not fit for the particular purposes for which they were required including the protection of the safety, health, and physical well-being of firefighters but instead were defective when sold; contained toxic PFAS chemicals; posed a risk of exposure to toxic PFAS chemicals; lacked adequate warnings or instructions regarding the

risks and dangers of PFAS further rendering such products unreasonably dangerous and unfit for the purposes for which they were purchased; and require limitations on use, and the discontinuation of use, to limit potential exposure to toxic chemicals.

395. The Plaintiffs and class members relied on the skill or judgment of the Defendants to provide products that were fit for the purposes for which they were purchased which include the protection of the safety, health, and physical well-being of firefighters.

396. The Defendants knew or had reason to know that the Plaintiffs and class members would purchase the Defendants' products for the purpose of protecting the safety, health, and physical well-being of firefighters.

397. To the extent necessary, Plaintiffs and class members have had sufficient dealings with Defendants to satisfy requirements of privity between Defendants, on the one hand, and Plaintiffs and class members, on the other hand.

398. Plaintiffs and class members provided Defendants with notice of the breach of this implied warranty within a reasonable time after discovering, or when they should have discovered, the above-mentioned breaches.

399. As a direct and proximate result of the breach of warranties by Defendants, Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, Plaintiffs purchased and paid for products that were not fit for the particular purpose for which they were purchased and that did not conform to what was promised, promoted, marketed, and advertised by Defendants. Plaintiffs and class members were thereby deprived of the benefit of their bargain, and purchased products that did not have warranted benefits or value or had less benefits or value than warranted or that they would not otherwise have purchased.

400. Defendants' motive of increasing profits at the expense of risks to human health posed by turnout gear purchased by Plaintiffs and the class members was morally wrong and Defendants' conduct showed a reckless disregard of the rights of Plaintiffs and class members.

401. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products containing PFAS or purchased Defendants' turnout gear products containing PFAS when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT VI**
**Illinois Consumer Fraud and Deceptive Business Practices Act Violation**
**(815 ILCS 505/2)**

402. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

403. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

404. Pursuant to 815 ILCS 505/2:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact ...are hereby declared unlawful whether any person has in fact been misled, or damaged thereby.

405. Defendants have engaged in unlawful, deceptive, and unfair business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), as set

forth above.

406. At all times relevant to this Complaint, Defendants violated ICFA by making and disseminating untrue, false, and misleading statements about PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS, but Defendants' products were not as represented and marketed by Defendants including for the protection of the safety, health, and physical well-being of firefighters, but instead were defective when sold; contained toxic PFAS chemicals; posed a risk of exposure to toxic PFAS chemicals; lacked adequate warnings or instructions regarding the risks and dangers of PFAS further rendering such products unreasonably dangerous and unfit for the purposes for which they were purchased; and require limitations on use, and the discontinuation of use, to limit potential exposure to toxic chemicals.

407. Defendants' marketing and advertisements for and labeling and packaging of their PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS concealed and failed to adequately disclose or warn that such products were not suitable for the protection of firefighters' health, safety, and physical well-being, among other unlawful conduct.

408. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as suitable for the protection of firefighters' health, safety, and physical well-being.

409. Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, sale, and marketing of products that are not suitable for the protection of firefighters' health, safety, and physical well-being; and b) the misrepresentations and omissions of material facts concerning the safety and suitability of their products offends public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage

and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

410. Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to reasonable consumers including the Plaintiffs and class members. Reasonable consumers, including the Plaintiffs and class members, would have found it material to their purchasing decisions that Defendants' PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS were not suitable for the protection of firefighters' health, safety, and physical well-being in the manner represented and/or pose risks to human health.

411. Knowledge of these facts would have been a substantial factor in Plaintiffs' and class members' decisions to purchase Defendants' turnout gear products.

412. Defendants owed Plaintiffs and class members a duty to adequately disclose or warn of these facts because Defendants possess and have always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to Plaintiffs and class members, concerning the manufacture, distribution, nature, and properties of their PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS and have at all relevant times been in a position to know, identify, and confirm the risks posed by their products; because the facts would be material to reasonable consumers; because Defendants actively concealed them; because Defendants intended for consumers to rely on the misrepresentations and omissions in question; because Defendants' products posed an unreasonable risk of substantial injury; and because Defendants made partial representations concerning the same subject matter as the omitted facts.

413. Defendants knew or should have known that their misrepresentations and omissions were false and misleading and intended for consumers, including Plaintiffs and class members, to rely on such misrepresentations and omissions.

414. Defendants' conduct actually and proximately caused actual damages to Plaintiffs and class members. Absent Defendants' unfair and fraudulent conduct, Plaintiffs and class members would have behaved differently and would not have purchased Defendants' turnout gear products or would have paid less for them. Defendants' misrepresentations and omissions induced Plaintiffs and class members to purchase Defendants' turnout gear products they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered.

415. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products or purchased Defendants' turnout gear products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to disgorge their ill-gotten profits; (d) prohibiting Defendants from making any further misrepresentations or omissions regarding the safety of turnout gear containing PFAS; (e) requiring Defendants to pay the costs of the suit, including attorneys' fees; (f) prejudgment interest; and (g) such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT VII**
**Negligence**

416. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

417. Plaintiffs bring this Count individually and on behalf of the class against all

Defendants.

418. As manufacturers, marketers, distributors, promoters, and/or sellers of PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS, Defendants owed a duty to Plaintiffs and class members to exercise due care in the design, manufacturing, promotion, marketing, sale, distribution, testing, labeling, use, warning, and instructing for use of PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS.

419. Defendants had a duty and the financial and technical means to warn Plaintiffs, class members, and the general public of the risks posed by PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS.

420. Defendants represented and claimed that their PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS would protect the safety, health, and physical well-being of firefighters, among other statements and omissions about the safety of turnout gear containing PFAS.

421. Any warnings Defendants provided were generic and were insufficient to warn reasonable users of the risks posed by turnout gear containing PFAS.

422. At times relevant to this litigation, Defendants knew or should have known that PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS pose risks to the health, safety, and well-being of firefighters, including that turnout gear contained toxic PFAS chemicals that pose risks to human health, posed a risk of exposure to toxic PFAS chemicals, and lacked adequate warnings or instructions regarding the risks and dangers of PFAS.

423. Turnout gear containing PFAS designed, manufactured, marketed, and/or sold by Defendants was used in a normal and foreseeable manner.

424. Defendants have negligently breached their duties of due care to Plaintiffs, class members, and the general public by among other things:

a. Promoting and defending PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS while concealing the threat that these products posed to human health;

b. Marketing and otherwise promoting the benefits of PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS without disclosing the truth about potential risks to human health posed by such products;

c. Failing to eliminate or minimize the harmful impacts and risks posed by PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS; and

d. Failing to instruct Plaintiffs, class members, and the general public about the risks, including to human health, posed by PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS.

425. The Defendants could reasonably foresee that the Plaintiffs and class members would rely on the representations, actions, and omissions of the Defendants as alleged in this Complaint, that the Plaintiffs and class members would thereafter purchase the Defendants' toxic PFAS-containing products, and that Plaintiffs and class members would subsequently be forced to limit the use of Defendants' products, replace the Defendants' products, and/or incur additional costs to properly dispose of the Defendants' products.

426. The Defendants' actions described above did, in fact, result in the Plaintiffs and class members purchasing toxic products that the Plaintiffs and class members must now replace, dispose, and otherwise ensure have only limited use.

427. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and class members have suffered damages in an amount to be determined at trial in that, among other things, Plaintiffs purchased and paid for products that did not conform to what was promised, promoted, marketed, and advertised by Defendants.

428. Defendants' motive of increasing profits at the expense of risks to human health posed by turnout gear purchased by Plaintiffs and the class members was morally wrong and Defendants' conduct showed a reckless disregard of the rights of Plaintiffs and class members.

429. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products or purchased Defendants' turnout gear products when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) such other and further relief as this Honorable Court may deem just, proper, and equitable.

**COUNT VIII**
**Unjust Enrichment**

430. Plaintiffs incorporate by reference all preceding allegations contained in this Complaint as though set forth fully herein.

431. Plaintiffs bring this Count individually and on behalf of the class against all Defendants.

432. At all times relevant to this Complaint, Defendants violated ICFA by making and disseminating untrue, false, and misleading statements about PFAS and PFAS-containing

products for use in turnout gear and turnout gear containing PFAS, but Defendants' products were not as represented and marketed by Defendants including for the protection of the safety, health, and physical well-being of firefighters, but instead were defective when sold; contained toxic PFAS chemicals; posed a risk of exposure to toxic PFAS chemicals; lacked adequate warnings or instructions regarding the risks and dangers of PFAS further rendering such products unreasonably dangerous and unfit for the purposes for which they were purchased; and require limitations on use, and the discontinuation of use, to limit potential exposure to toxic chemicals.

433. Defendants' marketing and advertisements for and labeling and packaging of their PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS concealed and failed to adequately disclose or warn that such products were not suitable for the protection of firefighters' health, safety, and physical well-being, among other unlawful conduct.

434. These omissions were misleading and deceptive standing alone and were particularly deceptive considering Defendants' advertising of their products as suitable for the protection of firefighters' health, safety, and physical well-being.

435. Defendants' conduct was unfair and unconscionable in that it included: a) the manufacture, sale, and marketing of products that are not suitable for the protection of firefighters' health, safety, and physical well-being; and b) the misrepresentations and omissions of material facts concerning the safety and suitability of their products offends public policy; was immoral, unethical, oppressive, and unscrupulous; was part of a pattern of sales conduct that would outrage and offend the public conscience; and caused substantial harm that greatly outweighs any benefits associated with the conduct.

436. Defendants' conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, cause confusion or misunderstanding to

reasonable consumers including the Plaintiffs and class members. Reasonable consumers, including the Plaintiffs and class members, would have found it material to their purchasing decisions that Defendants' PFAS and PFAS-containing products for use in turnout gear and turnout gear containing PFAS were not suitable for the protection of firefighters' health, safety, and physical well-being in the manner represented and/or pose risks to human health.

437. Defendants have profited and benefited from Plaintiffs' and class members' purchases of PFAS-containing turnout gear. Plaintiffs' and class members' payments for PFAS-containing turnout gear enriched the Defendants.

438. Defendants voluntarily accepted and retained these profits and benefits derived from Plaintiffs and class members, with full knowledge and awareness that, as a result of their misconduct, Plaintiffs and class members were not receiving products of the quality, nature, fitness, or value that Plaintiffs and class members, as reasonable consumers, expected but instead received turnout gear that contained toxic PFAS chemicals that posed risks to human health.

439. Defendants have been unjustly enriched by Plaintiffs and class members and otherwise benefited from the wrongdoing described herein at the expense of Plaintiffs and class members.

440. It would be unjust for the Defendants to retain the benefits that they received by manufacturing turnout gear with toxic PFAS chemicals, failing to warn about toxic PFAS chemicals, and affirmatively promoting the safety of PFAS and PFAS-containing turnout gear, among other acts and omissions.

441. Defendants' retention of the benefits resulting from the wrongdoing alleged herein which caused Plaintiffs and class members to expend scarce public resources on products contaminated with toxic chemicals and which could potentially expose those charged with

protecting public safety and welfare to toxic chemicals, violates fundamental principles of justice, equity, and good conscience.

442. Defendants requested and received a measurable benefit at the expense of Plaintiffs and class members in the form of payment for Defendants' products.

443. There is no justification for Defendants' retention of this benefit.

444. Thus, it would be unjust for Defendants to retain the ill-gotten benefits that they received from Plaintiffs and class members without restitution to Plaintiffs and class members.

445. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the class suffered injuries and seek the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

446. Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

447. To the extent that equitable relief is sought under any of the above claims, Plaintiffs plead such claims in the alternative to any legal claims without which Plaintiffs would not have adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide a different amount of relief. The difference between the value of restitutionary and legal relief will therefore remain unknown until, at the earliest, the completion of expert reports and discovery.

448. WHEREFORE, Plaintiffs and class members seek judgment against all Defendants: (a) for actual or compensatory damages to Plaintiffs and class members who overpaid for Defendants' turnout gear products containing PFAS or purchased Defendants' turnout gear products containing PFAS when they otherwise would not have done so; (b) requiring Defendants to pay restitution on any money acquired as a result of Defendants' misrepresentations and omissions; (c) requiring Defendants to pay the Plaintiffs and class members punitive damages; (d) requiring Defendants to disgorge their ill-gotten profits; and (e) such other and further relief as this Honorable Court may deem just, proper, and equitable.

## PRAYER FOR RELIEF

449. Plaintiffs, on behalf of themselves and the proposed classes, respectfully request that the Court determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), direct that reasonable notice of this action be given to the class, declare Plaintiffs as the named representatives of the class, and appoint Plaintiffs' counsel as class counsel. Plaintiffs further request that the Court enter judgment against Defendants and in favor of Plaintiffs and the class, award damages including statutory, punitive, and multiple damages as provided by law, and order restitution to the classes in an amount to be determined at trial, together with interest in accordance with law, as well as the relief requested in each count above. Plaintiffs also seek disgorgement from Defendants, an award of costs of suit including reasonable attorneys' fees, and such further relief as may be just and proper under the circumstances.

## LACK OF ADEQUATE REMEDIES AT LAW

450. To the extent that equitable relief is sought under any of the above claims, Plaintiffs plead such claims in the alternative to any legal claims without which Plaintiffs would

not have adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide a different amount of relief. The difference between the value of restitutionary and legal relief will therefore remain unknown until, at the earliest, the completion of expert reports and discovery.

**DEMAND FOR JURY**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the class, demand a trial by jury on all issues triable.

Dated: September 11, 2026

Respectfully Submitted,

*/s/ Jack D. Franks*

Jack D. Franks
**FRANKS GERKIN PONITZ GREELEY, P.C.**
19333 E. Grant Hwy.
Marengo, IL 60152
Telephone: 815-923-2107
jfranks@fgpglaw.com

Matthew F. Pawa (*pro hac vice* forthcoming)
K. Allen Brooks (*pro hac vice* forthcoming)
Benjamin A. Krass (*pro hac vice* forthcoming)
**PAWA LAW GROUP, P.C.**
1280 Centre Street, Suite 230
Newton Centre, MA 02459
Telephone: 617-641-9550
mp@pawalaw.com
abrooks@pawalaw.com
bkrass@pawalaw.com

James Bilsborrow (*pro hac vice* forthcoming)
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Telephone: 212-558-5500
jbilsborrow@weitzlux.com

Michael Piggins (*pro hac vice* forthcoming)
**WEITZ & LUXENBERG PC**
3011 W. Grand Blvd., Fl. 24
Detroit, MI 48202
Telephone: 231-366-3108
mpiggins@weitzlux.com

*Counsel for Plaintiffs*